IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

IN THE INTEREST OF:
I.B., a child

Case No.  5D13-2796

_____/

Opinion filed July 11, 2014

Appeal from the Circuit
Court for Seminole County,
Donna L. McIntosh, Judge.

Jerri A. Blair and George E. Carr, Jerri A.
Blair, P.A., Tavares, for Keith and Heidi
Farling.

Christine E. Arendas and Natalie Martin
Weech, Arendas Law, P.A., Saint Cloud,
for Sheritta Burt.

H. Kyle Fletcher, Arendas Law, P.A.,
Saint Cloud, for C.A.

Rosemarie Farrell, Children's Legal
Services, Orlando, for Florida Department
of Children and Families.

Laura E. Lawson, Tavares for Guardian
Ad Litem Program.

ON MOTION FOR REHEARING

PER CURIAM.

Upon review of the motion for rehearing filed by Jerry A. Blair, we withdraw the

previous opinion issued on May 9, 2014, and substitute this opinion in its place.

Blair, in her capacity as the adoption intermediary for the prospective adoptive parents (foster parents), appeals the trial court's order striking the adoption consent form executed by C.A., the biological mother (mother). Determining that there is insufficient evidence in the record to support the trial court's finding of duress, we reverse. However, we remand this matter for the trial court's consideration of whether there is any other basis for invalidating the adoption consent at issue.

I.B., the minor child, was removed from the custody of his parents and placed in foster care. During a status hearing, the biological parents advised the trial court that the parents were proceeding with a private adoption by the child's paternal aunt. Following that hearing, the foster care liaison was approached by the maternal grandmother and a maternal aunt regarding the possibility of having the foster parents adopt the child, saying that the mother did not want the child to be adopted by the paternal aunt. Subsequently, the foster care liaison was informed that the mother agreed to consent to adoption by the foster parents. As a result, at approximately 10:00 one evening, the liaison and a notary went to the jail where the mother was being housed to obtain her signature on an adoption consent form. The mother signed the consent form, but it was later determined that the consent form was invalid because it was not properly executed. A different notary then went to the jail to obtain the mother's execution of a second consent form. The mother signed the second consent form.

Thereafter, Blair filed a petition to terminate the mother's parental rights and an adoption petition on behalf of the foster parents. The consent form signed by the mother was attached to the petition. The paternal aunt's intermediary responded by filing a motion

2

to strike the mother's consent form. The mother thereafter adopted the paternal aunt's motion to strike her consent.

The trial court held an evidentiary hearing on the motion to strike. During the hearing, the mother testified that, on the night she signed the first consent form, her attorney was not present and she did not know that the liaison and notary were visiting her on behalf of the foster parents. According to the mother, she was told it was going to be an "open adoption," but the intermediary did not explain to her what that term meant. The mother understood the term to mean that "anybody can come in and adopt [her son]." When asked if she had an understanding about whether she would have visitation rights, the mother replied "no." She further testified that she did not understand what she was signing; however, she understood the documents would terminate her parental rights and would allow her child to stay permanently with the foster parents and that, if the foster parents did not choose to allow her to have visitation with her son, there was nothing she could do about it. The mother testified that no one explained what the consent meant, she was not provided a copy of the consent form, and no one advised her of her right to revoke her consent within three days of its execution. The mother further testified that she felt pressured by her family to agree to allow the foster parents to adopt her son. When asked about her execution of an affidavit of intent to work with Blair, the mother testified that she did not understand that she had already signed the first consent form to work with the foster parents. She testified that she read through the affidavit, but did not understand that she was agreeing to work with the foster parents. When asked whether she asked her attorney any questions about the affidavit, the mother replied "yeah, but she didn't want to answer no questions." She said that her "lawyer didn't explain anything to me."

3

The mother was questioned about her execution of the second consent form by the paternal aunt's adoption intermediary, Attorney Christine Arendas:

> [ARENDAS]: [Mother], do you recall the people that came for the signature on the second consent, the January 26th consent?
> [MOTHER]: My lawyer was there and there was people on the other side of the glass [who] wanted me to sign it.
> [ARENDAS]: Do you know who those people were?
> [MOTHER]: No.
> [ARENDAS]: Do you know if they had any affiliation with Ms. Blair?
> [MOTHER]: No.
> [ARENDAS]: Did they actually meet with you in person?
> [MOTHER]: No, ma'am.
> [ARENDAS]: Did they speak with you?
> [MOTHER]: No, ma'am.
> [ARENDAS]: Did they explain what you were signing to you?
> [MOTHER]: No, ma'am.
> [ARENDAS]: Did you understand what you were signing at the time?
> [MOTHER]: I felt like I was pressured, so I just signed away.
> . . . .
> [ARENDAS]: And you felt pressure from your family?
> [MOTHER]: Yeah.

Arendas then questioned the mother about what induced her to sign the consent forms for the foster parents:

> [ARENDAS]: So, you felt like you were being pressured into signing?
> [MOTHER]: Yes.
> [ARENDAS]: Would you have signed but for the promise that you would see your son?
> [MOTHER]: Could you repeat that again?
> [ARENDAS]: Would you have signed consents for [the foster parents] to adopt your son but for the promise that you would see him again?
> . . . .
> [MOTHER]: Oh, no.
> [ARENDAS]: Okay.
> [MOTHER]: I want the promise.

4

> [ARENDAS]: . . . I just want to make sure we're all clear here. Because of the promise that you would be able to see him again, you agreed to sign the consents?
> [MOTHER]: Yes.

According to the mother, she was not provided with a copy of the second consent form, and again she was not advised that she had three days in which to revoke her consent. She testified that her lawyer was present at the signing of the second consent form, but counsel did not provide assistance to her. Counsel told the mother to "just sign the consent paper."

Next, the mother testified about a subsequent meeting between herself, her attorney, and Arendas. During this meeting, the three reviewed the first and second consent forms. Arendas explained to the mother each of the statutory disclosure items. She also explained that the mother had a three-day right of revocation, that Florida does not allow open adoptions per se, and that the foster parents could deny the mother visitation after she executed the consent form. The mother did not recall any of those items being explained to her by the foster care liaison and/or the notaries. The mother acknowledged previously agreeing to adoption by the paternal aunt, and she said she changed her mind due to pressure from her family. She also testified that she felt no pressure while signing the consent form for the aunt to adopt.

Following the hearing, the trial court entered an order striking the consent form executed by the mother. The court found that "by the time [the intermediary] went to the jail [the first time], family had already coerced the mother into signing the consent." The court further found that the mother "was a bit confused regarding whether she was aware that the foster parents could deny her visitation; however, she did clearly testify that she

5

would not have signed the consent to adopt without a promise that she would be able to see her son again." Thus, the court concluded that the mother "did not fully understand what she was signing." Additionally, the court found that the mother did not understand the affidavit of intent to work with Blair, and that she felt pressured to sign that affidavit. As to the signing of the second consent form, the court stated:

> As the notary and two witnesses could not speak with [the mother] or hear her, there was no evidence that she took an oath, acknowledged that she read the consent, verified its contents to be true and correct and executed it freely and voluntarily as indicated in the notary's certification in the consent.

Citing In re Adoption of P.R. McD., 440 So. 2d 57 (Fla. 4th DCA 1983), the court concluded that the mother "was not provided with any counseling regarding the nature of the documents she was signing or their legal effects" and, therefore, her consent was not voluntary.

We review the trial court's order for an abuse of discretion. See R.B. v. Dep't of Children & Families, 997 So. 2d 1216, 1218 (Fla. 5th DCA 2008); W.T. v. Dep't of Children & Families, 846 So. 2d 1278, 1281 (Fla. 5th DCA 2003).

Upon executing a consent for the adoption of a child older than six months of age, the parent has three days in which to revoke that consent. § 63.082(7)(a), Fla. Stat. (2012). Generally, after the expiration of the three-day revocation period, consent can be set aside only when the court finds that the consent was obtained by fraud or duress. § 63.082(7)(f), Fla. Stat. (2012). Duress is defined as "[a] condition of the mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition." T.G. v. Dep't of Children & Families, 9 So. 3d 48, 49 (Fla. 4th DCA 2009) (quoting Herald v.

6

Hardin, 116 So. 863, 864 (Fla. 1928)). The parent seeking to set aside the consent bears the burden of establishing duress by clear and convincing evidence.  K.C. v. Adoption Servs., Inc., 721 So. 2d 811, 812 (Fla. 1998).

Blair argues that the trial court erred in concluding that the paternal aunt proved, by clear and convincing evidence, that the mother's consent was obtained by duress. We agree. As such, we must reverse the trial court's order striking the mother's consent form. However, the court also found that various procedural violations of the adoption statutes occurred in the process of procuring the mother's consent.

Section 63.2325, Florida Statutes (2012), provides that the failure to meet a requirement of the adoption statute does not constitute grounds for revocation of consent to adoption "unless the extent and circumstances of such a failure result in a material failure of fundamental fairness in the administration of due process, or the failure constitutes or contributes to fraud or duress in obtaining a consent to adoption . . . ." Here, the court found that the foster parents' intermediary held the pre-consent meeting without the mother's attorney being present, and that neither a representative of the adoption entity nor the mother's attorney was present when the mother signed the consent form. In addition, the court found that the mother was not provided with reasonable notice of her right to select a witness of her own choosing, as required by section 63.082(4)(d), Florida Statutes (2012). These procedural safeguards are in place to ensure that biological parents are fully advised of the legal ramifications of consenting to adoption and to prevent undue pressure from being exerted by the adoption entity.

Accordingly, although the evidence in this case was not sufficient to prove duress by clear and convincing evidence, we remand this matter to the trial court for a

determination of whether the evidence supports the striking of the mother's consent form

on another basis, as authorized in section 63.2325, Florida Statutes.

      REVERSED and REMANDED.

PALMER and COHEN, JJ. concur.
EVANDER, J., concurs specially with opinion.

EVANDER, J., concurring.

I believe it is a close call as to whether there was sufficient evidence to support the trial court's determination that duress had been proven by clear and convincing evidence. Regardless, given the circumstances surrounding the actual execution of the consent documents, the trial court had good reason to closely examine whether the mother's consent was uncoerced and otherwise valid.

In the instant case, the first consent form was executed late at night at the Seminole County jail without the mother's attorney being present. The second consent form was executed at the jail with the mother being separated from those seeking her signature by two glass walls. As a result, the mother was unable to verbally communicate with those individuals and resorted to using hand signals. Furthermore, the notary who brought the second consent form to the jail was only able to obtain access to the mother (limited as it was) through the use of a password. The notary was given the password by the foster mother who had received it from the maternal grandmother. The foster mother testified that, according to the maternal grandmother, the mother required the use of a password so that she would know that she was signing a consent for the foster parents. The use of a password, again according to the maternal grandmother, was necessary because the mother feared that her attorney would "trick her" into signing a consent in favor of the paternal aunt.

Section 63.082(1)(a)3., Florida Statutes (2012), provides alternative methods for executing a consent to adopt:

9

**§ 63.082. Execution of consent to adopt or affidavit of nonpaternity; family social and medical history; revocation of consent.--**

(1)(a) Consent to an adoption or an affidavit of nonpaternity shall be executed as follows:

. . . .

3. If by any other person, in the presence of the court or by affidavit acknowledged before a notary public and in the presence of two witnesses.

I would suggest that although not required by statute, the preferable method where there are two or more competing parties seeking to obtain a parent's consent to adopt, if feasible, is to have the parent execute the consent in open court. In the instant case, the late night visit to the jail, the use of a password, the utilization of hand signals because of physical separation at the jail, and the alleged fear of being tricked by one's own counsel could readily have been avoided by having the mother transported from the Seminole County jail to the Seminole County Courthouse for the purpose of having her execute a consent document in open court. Doing so would have also provided the trial judge with the opportunity to engage in a meaningful dialogue with the mother to ensure that any consent given by the mother was the result of an informed and uncoerced decision.